THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
IGUSTER NUNN *et al.*, Defendants-Appellants.

First District (4th Division) No. 1—85—1486

Opinion filed June 29, 1989.

Randolph N. Stone, Public Defender, Steven Clark, Michael J. Pelletier and Kenneth L. Jones, all of State Appellate Defender's Office, M. Jacqueline Walther, of Kielian & Walther, and Joshua Sachs, all of Chicago (Hugh Stevens, Assistant Public Defender, of counsel), for appellants.

Richard M. Daley, State's Attorney, of Chicago (Paula Carstensen and Eugene Hollander, Assistant State's Attorneys, of counsel), for the People.

JUSTICE McMORROW delivered the opinion of the court:

A jury in the circuit court of Cook County found defendants William R. Sewell, Iguster Nunn, Paris Lee Nunn, Leonard Thomas, Paul Thomas, Gregory Young, and Leonard Collier guilty of murder. (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(a)(1).) It also found defendants Leonard Collier, Gregory Young, and Paris Nunn guilty of armed robbery. (Ill. Rev. Stat. 1983, ch. 38, par. 18—2.) In a simultaneous bench

trial, the court found an eighth defendant, Byron Reed, guilty of murder and armed robbery. Judgments were entered upon these verdicts and sentences imposed ranging from 22 to 60 years' imprisonment, and all of the defendants now appeal.

None of the defendants testified at their joint trial, and each requested a separate trial on the grounds that (1) each had made inculpatory post-arrest statements also implicating the other defendants which would be admitted into evidence at trial; and (2) various defendants intended to present antagonistic defenses. We find harmless beyond a reasonable doubt the trial court's denial of defendants' motions for separate trials. We further find no abuse of discretion in the trial court's refusal to pose to prospective jurors a question suggested by defendants which asked, in substance, if a defendant's mere presence at the crime scene would create a presumption of the defendant's guilt in the minds of the jurors. We also find no reversible error in the trial court's exclusion of the testimony of a People's witness that he heard an unidentified person declare during the incident that "he" had struck "him" in the mouth.

We determine that the State did not wilfully fail to disclose a tape recording to the defense, since the tape recording requested by the defendants was inadvertently erased prior to the court's order that the recording be preserved. We further conclude that the defendants were not prejudiced by a tardy disclosure of a disciplinary file regarding a State's witness, since the disciplinary file in question contained no pertinent material relevant to the credibility or impeachment of the State's witness to whom the file pertained. We also find no reversible error in certain remarks made by the State during closing argument.

Although it was proper to instruct the jury with respect to defendant Collier regarding voluntary manslaughter based on a belief in self-defense, we find the trial court properly declined to instruct the jury, with respect to defendant Collier, on voluntary manslaughter caused by sudden provocation. We further determine that the record supports the trial court's conclusion that the inculpatory statements of defendants William Sewell and Byron Reed were voluntary, and their statements were therefore properly admitted at trial with respect to each of them individually. We also find that the assistant public defender representing William Sewell at trial was not laboring under a conflict of interest.

Accordingly, we affirm the conviction of Byron Reed. Because the seven remaining defendants, who were tried by a jury, maintain that the State exercised its peremptory challenges in a racially discrimina-

tory fashion, we remand the matter to the trial court for a hearing pursuant to *Batson v. Kentucky* (1986), 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712, for these defendants. The convictions of these seven remaining defendants are otherwise affirmed.

BACKGROUND

On September 7, 1983, at approximately 8:30 p.m., LeAnne Harvey (Harvey), who lived at 160th and Wood Street in Harvey, Illinois, looked into the weedy lot immediately adjacent to her home. She saw a slender young male pulling on another male subject in an apparent attempt to get him to leave the area. James Perryman (Perryman), who lived nearby, was in his home and heard some commotion on the street. He went out to the sidewalk and saw three young men walking in one direction and another man going in the other direction down the street. This latter individual was carrying something in his hand that was about 2 or 2½ feet long.

Paulette Nesbit (Nesbit) was driving north on Wood Street at approximately the same time. As she approached the area, she noticed about two people running across Wood Street. As she got closer, three more people ran across the street and caught up to the first group. A few of them were carrying sticks or something of that nature. Nesbit circled the block and drove back past the same vicinity. At this time, the group appeared to be fighting or scuffling. She drove beyond the scene, turned around, and drove back again. As she started back, she saw an individual leaving the scene. The person appeared to have a pipe about 2½ feet long and was wearing shorts. Nesbit again turned around and drove back toward the scene. She then saw three other persons walking down the street in the opposite direction from that of the individual she had seen previously with a pipe.

Harvey, Perryman, and Nesbit met on the street in the vicinity of the occurrence. They walked down the street and found John Thomas, unconscious and badly injured, lying in the field next to Harvey's residence. An officer of the Harvey police department was called to the scene. He found the bottom half of a wooden cane lying on Thomas' back; Thomas' pants pockets were turned inside out. A piece of chain about three feet long and the top portion of a wooden cane were found nearby. Thomas died from his wounds shortly thereafter. Forensic evidence indicated that he had sustained severe and multiple internal injuries, particularly to the head and left lung.

Police investigation ultimately led to the arrests of the eight defendants. Each of the defendants was initially questioned by Officer

Newton of the Harvey police department, and each gave an oral inculpatory statement to the police officer regarding his involvement in the crime. After Officer Newton concluded his interrogations of the defendants, Assistant State's Attorney Burns of the Cook County State's Attorney office interviewed each defendant. Each defendant made statements regarding his participation in the crime to Assistant State's Attorney Burns. All of the statements made to Officer Newton and Assistant State's Attorney Burns were oral and none of the statements was reduced to writing. Testimony of Officer Newton and Assistant State's Attorney Burns regarding each of the defendant's statements was as follows.

### LEONARD COLLIER

Officer Newton testified that when he first interviewed Leonard Collier (Collier), Collier said that he knew nothing of the incident at all. Newton told Collier that he had been informed that Collier was involved. Newton asked Collier if his tooth was hurting on the left-hand side and if he could look at it. Newton noticed some small swelling around the gum area. Collier then told Newton that he had been involved in the incident and that he had been walking north on Wood Street with the seven other defendants. They had been following an older gentleman. This individual thought that Collier was following him too closely, because the man turned around and hit Collier in the jaw. After the man hit him in the jaw, the others ran up and began beating on the man. Collier said he never touched the man.

At a later interview, Collier told Officer Newton that he would recount what had actually happened on the night in question. He stated that as he was walking north he saw an older man walking in the same direction in front of him. Collier ran up, tackled the man, and knocked him down. The man hit Collier in the jaw, hurting Collier's abscessed tooth. At this point the seven other defendants ran up and began beating on the subject. Collier said that he hit the victim twice in the stomach and several times on the legs, and saw the others using their hands and feet to also strike the victim. Collier also stated that he did not have any weapons in his possession. He saw Leonard Thomas use a pipe upon the victim, Paul Thomas use a chain, and Gregory Young use a cane. Collier said he found $2 lying on the ground next to the victim's body, picked it up and used it to buy beer at the liquor store. Collier took the beer back to the Thomas residence and shared it with the others.

Assistant State's Attorney Burns stated that Collier told him the following. As the group was walking towards 159th Street, Collier

thought he recognized a man who once jumped him. He ran up to this person, who was not doing anything, and tackled him. All of the others ran up to where Collier was and began striking the person. Collier then said that because it was so dark outside at the time, he could not see the person's face and had no idea who it was. Collier related that he hit the victim in the stomach with his fist and kicked him in the legs. He also said he took $2 from the victim. Collier identified the chain recovered from the scene as the one he wore around his neck that night.

### GREGORY YOUNG

Officer Newton testified that Gregory Young said he was at the Thomas residence with the other seven defendants. They decided to buy some beer and started to walk to a liquor store. They walked north on Wood Street. Collier, who was walking ahead of the group, suddenly ran up and jumped on an older man who was walking ahead of them. Gregory Young and the others ran up to see if they could give some assistance and began beating on the individual who was fighting with Collier. Gregory Young said he had a cane and hit the victim on the ground once with the cane. The cane broke and Gregory Young left it there. During the struggle, Gregory Young had to pull Collier off the man after the man became unconscious. Gregory Young then saw Collier go into the man's pocket and take money. They bought some more beer and went back to the Thomas residence.

Assistant State's Attorney Burns testified to the following regarding Gregory Young's statement of the incident. Gregory Young said that it was around 8:15 p.m. and he was at the Thomas residence. Gregory Young and the other seven defendants left the Thomas home and began walking down Wood Street. Collier was walking alone ahead of the group. Gregory Young saw a man walking along who was not part of the group. He saw Collier break away, run toward the individual, and tackle the person. When this happened, the rest of the group ran to where Collier and the person were scuffling and began to strike and beat the individual. Burns asked if he had also hit the man, and Gregory Young said that he had. Gregory Young's father then interjected, saying that he would prefer that his son speak to a lawyer before answering any more questions. Gregory Young agreed, and the interview was terminated.

### PARIS LEE NUNN

Officer Newton testified that when first questioned, Paris Nunn indicated he knew nothing about the incident. Later, Paris Nunn ad-

mitted that he had been at the Thomas residence on Wood Street, that he left with the other seven individuals, and that they walked north on Wood Street. Paris Nunn saw Collier run up behind an older man who was walking ahead of them. Collier jumped on the man from behind, knocking him down into some bushes. When this happened, the rest of the group, including Paris Nunn, then ran across to where the scuffle was taking place and began beating on the man. He and his brother, Iguster Nunn, had to get out of the way at one point to avoid being hit by the weapons that others were using upon the victim.

After the beating, which lasted a couple of minutes, Paris Nunn saw Paul Thomas and Gregory Young pulling Collier off the victim as Collier continued to beat on him. The victim appeared to be unconscious. Paris Nunn saw Collier take about $4 from the victim's pockets. Thereafter they left and went to a corner liquor store and bought some beer, which they took back to the Thomas residence.

Assistant State's Attorney Burns testified that Paris Nunn said he was at the Thomas house with the other seven defendants. They left the house and began walking north on Wood toward 159th Street. As they were walking, Paris Nunn noticed a slim, older man walking ahead. Collier broke away, ran up to where the person was and tackled the man. The rest of the group caught up to where Collier and the person were fighting. Collier was shouting, and Paris Nunn and the others "helped [Collier] get the man." Collier was injured, and Paris Nunn believed that Collier was losing the fight. Paris Nunn said that while they were hitting the victim, the victim was shouting for them to stop. Paris Nunn stated that Leonard Thomas had a stick, Paul Thomas a chain, and Gregory Young a cane. From a photo, Paris Nunn identified the part of the cane found at the scene as the cane Gregory Young had been carrying on the night in question. Paris Nunn said he hit the victim a couple of times with his hands. He did not know who the man was. When Paris Nunn left the scene, the man was on his back.

### IGUSTER NUNN

Officer Newton testified to the following regarding Iguster Nunn's statement to him. Iguster Nunn told Newton that he had been with the seven other defendants drinking at the Thomas residence. They left the home to go to a liquor store and walked north on Wood Street spread out across the road. Collier went ahead of the others, approached an older man walking in the street in front of him, and jumped on the man from behind, pushing or knocking him to the

ground. Iguster Nunn saw Collier and the man begin to struggle. Iguster Nunn and the others ran up and Iguster Nunn heard Collier say "the *** hit me in the teeth." Collier was on top of the victim, hitting him with a chain. The others assisted Collier in beating on the victim, who was on the ground. Iguster Nunn and his brother, Paris Nunn, hit the victim. Iguster Nunn said he did not remember what the others were using, but everyone joined in to hit the victim. All of them subsequently left the scene. Iguster Nunn left southbound through an alley.

Assistant State's Attorney Burns testified to the following regarding Iguster Nunn's statement of the incident to Burns. Iguster Nunn told Burns that he and the seven others were at the Thomas home and decided to go buy some beer at a local liquor store. As they were walking north on Wood Street toward 159th Street, Collier broke away from the crowd, ran ahead of them, and tackled a man walking on the street ahead of the group. Iguster Nunn said that no words or gestures were exchanged prior to the time Collier tackled the man and that Collier tackled the victim for no apparent reason. The rest of the group ran to where Collier and the other person were and began beating the victim. Iguster Nunn said he kicked the man in the legs and that he got involved to help Collier since the victim had hit Collier. He also said that Gregory Young had a cane and Leonard Thomas had a pipe. Iguster Nunn said that he ran to his girlfriend's house after the incident.

### PAUL THOMAS

Officer Newton testified that at the initial interview, Paul Thomas said he knew nothing about the incident. At a second interview, Paul Thomas said that he and the seven others had been at his house. As he and the others were walking north on Wood Street toward 159th Street, Paul Thomas saw Collier, who was walking ahead of the others, come up behind an older man and jump onto or push down an older gentleman who was walking ahead of them in the same direction. A scuffle followed, and Paul Thomas and his friends then ran to assist Collier because the man was fighting back and it appeared that Collier might be losing the fight. Paul Thomas stated that he hit the man several times with his hand. The victim was lying on the ground at the time. His brother, Leonard Thomas, struck the victim with a pipe, and Gregory Young hit him with the cane. Paul Thomas also said that during the struggle one of the other defendants struck him on the back with a chain. Paul Thomas identified the chain found at the scene as the same one Collier was wearing the night of the inci-

dent. Paul Thomas and the others stopped beating the man once he became unconscious. However, Collier continued to strike the victim, and Gregory Young had to pull Collier off the victim. They left and went north to the liquor store. Along the way, Paul Thomas heard Collier say that he was going to go back and kill the victim. Paul Thomas and the others restrained him from going back.

Assistant State's Attorney Burns testified to the following regarding Paul Thomas' statement of the incident to Burns. Paul Thomas told Burns that he and the others were at his house the night of the incident. As they were walking together on Wood Street, Collier ran ahead to a person who was walking by himself, tackled him, and began fighting. Paul Thomas and the others ran to help Collier, who was losing the fight, and started to hit the victim. The beating lasted three or four minutes. Paul Thomas said he hit the victim three or four times with his hands in the chest and stomach area. Paul Thomas also said that William Sewell had a stick, Collier a chain, and Gregory Young a cane. After the victim became unconscious, Paul Thomas and Gregory Young had to pull Collier off the victim. The others had already stopped beating the victim. Paul Thomas stated that he saw Collier take $2 from the pocket of the victim. After they broke up, Collier went back and struck the victim and said he was going to kill the man.

### LEONARD THOMAS

Officer Newton testified that Leonard Thomas told him that he and the others were drinking at the Thomas house. They decided to go get some beer and walked north on Wood Street to a local liquor store. Leonard Thomas, Iguster Nunn, and William Sewell walked on the west side of the street as the others were spread across to the east side of the street. Leonard Thomas said he saw or heard a scuffle and ran up to where it was taking place. He saw Collier on top of an older man who was on the ground. Collier was striking the man. Leonard Thomas said he struck the man once with his pipe. The others ran up and also began beating on the subject. Leonard Thomas stated that he dropped his pipe, and William Sewell picked it up and struck the victim two or three times. Leonard Thomas then retrieved the pipe from William Sewell and walked southbound back to his house on Wood Street. Collier later asked Leonard Thomas why Leonard Thomas had hit Collier with the pipe.

Assistant State's Attorney Burns testified to the following regarding Leonard Thomas' statement of the incident to Burns. Leonard Thomas said he and the seven others were at his home. They decided

to go get some beer, and the others left a few minutes before he did. When he left, he was carrying a two-foot metal pipe because he had recently been chased by some boys carrying bats. When he caught up with the rest of the group, he heard yelling and saw Collier and another person scuffling. The others were also there, and everyone began striking the man. Leonard Thomas swung the pipe and hit the person Collier was struggling with. He swung the pipe a second time and hit Collier. William Sewell took the pipe from him and used it to hit the victim. Leonard Thomas remembered that the man was not able to say anything and that Collier was saying "[T]his *** is going to die," after which everyone ran, and he ran home.

### BYRON REED

Officer Newton testified to the following regarding Byron Reed's statement to him. At the first interview, Byron Reed denied knowing anything about the incident. Later when Byron Reed was told that others said he was involved, Byron Reed said that he had been with the seven other defendants at the Thomas residence. They left to get some beer. Byron Reed said he and William Sewell were on the west side of the street. Byron Reed saw Collier tackle an older man who was walking north in front of them. They ran across the street to assist Collier as he was struggling with the individual on the ground. When Byron Reed got there, Collier was on top of the victim and was beating him. Byron Reed got on top of the subject and hit him twice with his fists in the chest area. The victim told Byron Reed to let him up. As Byron Reed began to get off the subject, the victim hit him in the mouth with his fist. The others then knocked the man down and began beating on him again with a chain and sticks. At one point, Paris Nunn told Byron Reed to watch out; one of the others swung with a pipe and narrowly missed hitting Byron Reed. When it appeared the man had lost consciousness, they left the area northbound on Wood Street. As they started walking away, Byron Reed heard Collier say he wanted to go back and finish the man off. The others were able to talk him out of it. They went to the liquor store, bought some beer, and went back to the Thomas residence. The next day he learned at school that the man had died.

Assistant State's Attorney Burns testified to the following regarding Byron Reed's statement of the incident to Burns. Byron Reed said he was walking north on Wood toward 159th Street with the seven other defendants. Leonard Thomas was carrying a pipe and Gregory Young had a chain. Collier ran ahead of the group and tackled a man who was walking alone on the street. Immediately the rest of the

group ran to where Collier and this person were scuffling. When they caught up with Collier and the other man, the entire group began to strike the victim. Byron Reed hit the man twice with his hands in the chest area. At this time the victim was saying, "[L]et me alone, let me go." While the beating was going on, someone yelled "let's go" and everyone began to run.

### WILLIAM SEWELL

Officer Newton testified to the following regarding William Sewell's statement to him. When first interviewed by Newton, William Sewell stated that he knew nothing about the incident. At a second interview a few hours later, William Sewell stated that he and the seven other defendants were at the Thomas home and went to get some beer. William Sewell walked down Wood toward 159th Street, on the west side of the street, with Leonard Thomas. William Sewell saw Collier and the others walking down the east side of the street.

Collier ran toward an older person walking ahead of Collier and the others. Collier had a chain in his hands which he held outstretched in front of him. William Sewell saw Collier use the chain to strike the man somewhere between the man's head and shoulder area. The force knocked the older man down, and Collier got on top of the victim.

William Sewell and the others ran over to see if Collier "needed assistance." William Sewell saw Leonard Thomas strike the victim with a piece of pipe. Leonard Thomas handed the pipe to William Sewell and William Sewell struck the victim on the legs with it. Williams Sewell stated he saw Leonard Thomas hit the man with the pipe three times. He also saw Paris Nunn stomp with his foot on the victim's head and saw Gregory Young strike the victim with a cane. William Sewell stated he saw Leonard Thomas leave southbound, and a few moments later he followed Leonard Thomas back to the Thomas house.

Assistant State's Attorney Burns testified that William Sewell told him that as he and the seven other defendants were walking north on Wood toward 159th Street, Collier broke away from the rest of the crowd, ran ahead to where a man was walking by himself on the street, and tackled the person. When Collier tackled the man, the others, including William Sewell, ran up to the scene. Several began to also strike the victim. William Sewell said that Leonard Thomas had a pipe, Collier had a chain, and Gregory Young had a cane. William Sewell took the pipe from Leonard Thomas and struck the victim once in the legs. William Sewell said the victim was trying to strike back but was unable to because they "all kept hitting him." Thereaf-

ter they all ran. William Sewell ran away while the others continued to beat the victim.

At trial, Collier argued that he acted in either reasonable or unreasonable belief in his own self-defense. He maintained that the incident was a spontaneous occurrence and that he and the others had had no preconceived plan to murder or rob the victim. He also argued, based on his earlier statement to Newton, that it was the victim who had first attacked Collier and that he had acted in self-defense. Collier asserted that the others volunteered their help without any solicitation from Collier. Essentially Collier claimed that the State's evidence did not explain sufficiently what occurred on the night in question and was wholly inadequate to prove him guilty beyond a reasonable doubt of murder and armed robbery.

Each of the remaining seven defendants argued that he was not guilty of murder because the acts he had taken toward the victim were not sufficient to kill the victim or substantially contribute to his death. Each defendant urged that he was not accountable for the actions of the others because there was no plan or scheme contrived at the Thomas residence to kill or rob the victim and that the incident was a spontaneous occurrence. The defendants further argued that police investigation had been inadequate and the State's proof therefore insufficient to prove them guilty beyond a reasonable doubt. The defendants further argued that they participated to assist Collier once the scuffle began and that they acted in a reasonable or unreasonable belief that their actions were necessary to defend Collier. Gregory Young, Paul Thomas, Leonard Thomas, and William Sewell also maintained that they were not guilty because they had withdrawn from commission of the murder.

Collier was convicted of murder and armed robbery and sentenced to concurrent terms of 60 years' imprisonment. Gregory Young was convicted of murder and armed robbery and sentenced to concurrent terms of 25 years' imprisonment. Paris Nunn was convicted of murder and armed robbery and sentenced to 24 years' imprisonment. Iguster Nunn was convicted of murder and sentenced to 24 years' imprisonment. Paul Thomas was convicted of murder and sentenced to 22 years' imprisonment. Leonard Thomas was convicted of murder and sentenced to 25 years' imprisonment. Byron Reed was convicted of murder and armed robbery and sentenced to concurrent terms of 22 years' imprisonment. William Sewell was convicted of murder and sentenced to 22 years' imprisonment. All the defendants appeal from their convictions.

OPINION

Each of the defendants contends that the trial court should have granted him a separate trial. All argue that their right to confront one who testifies against them was infringed when the statements of their codefendants were admitted at the joint trial and none of the defendants testified therein.

■■■ Although defendants who are jointly indicted may also be jointly tried, separate trials for each defendant may be appropriate when one defendant who does not testify at trial has made statements to authorities, admitted at trial, that inculpate his codefendants in the alleged commission of the offense for which they stand charged. (*People v. Duncan* (1988), 124 Ill. 2d 400, 530 N.E.2d 423.) It is well recognized that "when one person accuses another of a crime under circumstances in which the declarant stands to gain by inculpating another, the accusation is presumptively suspect and must be subjected to the scrutiny of cross-examination." (*Lee v. Illinois* (1986), 476 U.S. 530, 541, 90 L. Ed. 2d 514, 526, 106 S. Ct. 2056, 2062-63, interpreting *Douglas v. Alabama* (1965), 380 U.S. 415, 13 L. Ed. 2d 934, 85 S. Ct. 1074; see also *People v. Cruz* (1988), 121 Ill. 2d 321, 521 N.E.2d 18.) As a result, if the declarant is a codefendant who refuses to testify at trial, and thus not subject to cross-examination, admission of the codefendant's statement violates the defendant's constitutional right to confront and cross-examine the witnesses who testify against him and generally cannot be admitted against the defendant. (*People v. Duncan* (1988), 124 Ill. 2d 400, 530 N.E.2d 423.) However, the codefendant's statement is admissible when the statement satisfies certain evidentiary and constitutional admissibility standards. (*Lee v. Illinois* (1986), 476 U.S. 530, 90 L. Ed. 2d 514, 106 S. Ct. 2056; *People v. Duncan* (1988), 124 Ill. 2d 400, 530 N.E.2d 423; *People v. Dixon* (1987), 169 Ill. App. 3d 959, 523 N.E.2d 1160.) Failure to sever is ground for reversal unless it can be said the trial court's failure to sever was harmless beyond a reasonable doubt. See, e.g., *People v. Smith* (1988), 172 Ill. App. 3d 94, 106, 526 N.E.2d 849, citing *Harrington v. California* (1969), 395 U.S. 250, 23 L. Ed. 2d 284, 89 S. Ct. 1726.

■■ ■ We need not and do not address the defendants' argument that they should have been afforded separate trials, because we conclude that any alleged error in failure to sever the defendants' trial was harmless beyond a reasonable doubt. All of the defendants were convicted of the murder of John Thomas on the ground that each was accountable for the actions of his codefendants, which, in the aggregate, caused the victim's death. A person is accountable for the

actions of another when "[e]ither before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense." (Ill. Rev. Stat. 1983, ch. 38, par. 5—2(c); see, *e.g., People v. Sanders* (1987), 168 Ill. App. 3d 295, 302-04, 522 N.E.2d 715.) The offense of murder is committed when a "person *** kills an individual without lawful justification [and] ***, in performing the acts which cause the death: (1) He either intends to kill or do great bodily harm to that individual *** or knows that such acts will cause death to that individual ***; or (2) He knows that such acts create a strong probability of death or great bodily harm to that individual ***." Ill. Rev. Stat. 1983, ch. 38, par. 9—1(a).

Collier told Newton and Burns that he attacked the victim without provocation and then saw all the other defendants run up to the scene and join him in striking the victim. Collier said that he himself hit the victim in the stomach with his fist and kicked him in the legs. Thus, by Collier's own admission, Collier precipitated the attack and thereafter participated in the assault with the seven other defendants. Collier's statement showed that he was well aware the assault amounted to a contest between eight young men against a solitary, middle-aged man. The autopsy revealed the victim suffered severe trauma, multiple lacerations, and died within minutes after the defendants fled the scene. The brutality of a crime is an indication that a protagonist intended to kill or cause great bodily harm to his victim. (*People v. Winters* (1963), 29 Ill. 2d 74, 193 N.E.2d 809; *People v. Allum* (1967), 78 Ill. App. 2d 462, 223 N.E.2d 187.) Based upon Collier's own statements and the other evidence of the crime, we find the evidence of Collier's guilt of murder overwhelming and conclude that the improperly admitted statements of Collier's codefendants were harmless beyond a reasonable doubt.

The conclusion we reach above with respect to Collier is equally applicable to each of the other defendants. The statements of the seven other defendants showed that each was accountable for the actions of the others and each possessed the intent to cause the decedent great bodily harm. Each of the other seven defendants told Newton and Burns that they were at the Thomas residence, decided to go to a local liquor store, were walking down Wood Street toward 159th Street, saw a fight break out between Collier and the victim, and ran to participate with the others in beating the victim. Every defendant told Newton and Burns that he himself hit the victim and that he saw the others also beating the victim. Based upon the statements from

the defendants themselves and the evidence surrounding the incident, each of the defendants was accountable for the actions of the others, shared the group's intent to cause the victim severe bodily harm, and was guilty of murder. Thus, the admission of the statements of any of the codefendants, while possibly violative of each defendant's confrontation clause rights, was harmless beyond a reasonable doubt. In view of the overwhelming evidence of each defendant's guilt, we find that the admission of the codefendants' statements did not constitute a material factor in the conviction of any defendant and that any error in the failure to sever or in the admission of the statements is not such as to prejudice any defendant to the extent of denying his right to a fair trial.

Furthermore, analysis of each defendant's statements, in conjunction with the evidence of the circumstances surrounding the death, demonstrates beyond a reasonable doubt that none of the defendants acted in a reasonable or unreasonable belief that the great bodily harm inflicted upon the victim was necessary to defend either himself or one of the other defendants.

■■ A person "is justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or another." (Ill. Rev. Stat. 1983, ch. 38, par. 7—1.) However, if one responds with such excessive force that one is no longer acting in self-defense but in retaliation, said excessive use of force renders one the protagonist; a nonaggressor has a duty not to become the aggressor. *People v. McGraw* (1958), 13 Ill. 2d 249, 149 N.E.2d 100; *People v. Estes* (1984), 127 Ill. App. 3d 642, 469 N.E.2d 275; *People v. Bailey* (1975), 27 Ill. App. 3d 128, 326 N.E.2d 550; see also Ill. Rev. Stat. 1983, ch. 38, par. 7—2.

■■ Furthermore, one cannot "[i]nitially provoke[ ] the use of force against himself, with the intent to use such force as an excuse to inflict bodily harm upon the assailant." (Ill. Rev. Stat. 1983, ch. 38, par. 7—4(b).) If an initial aggressor's use of force is countered with a "force *** so great that he reasonably believes that he is in imminent danger of death or great bodily harm, *** [the aggressor must] exhaust[ ] every reasonable means to escape such danger *** [before the aggressor himself will be justified in responding with] the use of force which is likely to cause death or great bodily harm." Ill. Rev. Stat. 1983, ch. 38, par. 7—4(c)(1).

■■ With regard to Collier's argument that he acted in an unreasonable belief that his conduct, and that of the seven other defendants, was necessary to protect himself from death or great bodily

harm, Collier initially maintains on appeal that his first and second statements to Newton show that Collier acted to defend himself in an attack initiated by the victim. Collier later disavowed these statements in a subsequent interview with Newton, thereafter admitted to Newton his provocation of and participation in the attack, and also told Burns that he had started the attack and joined the others in the assault upon the victim. Assuming *arguendo* that Collier acted upon an initial provocation by the victim as Collier had indicated in his first statement to Newton, the severity of the victim's injuries demonstrates that the response by Collier and the seven other defendants was wholly out of proportion to that necessary to defend Collier from the victim. The brutality of the defendants' attack upon the victim belies any argument by Collier that he was acting to defend himself. Rather, the record shows, viewed in the light most favorable to Collier, that Collier retaliated and became the aggressor; his conduct, as reflected in the record, does not reasonably permit the interpretation that he acted in an unreasonable belief that it was necessary to cause the victim great bodily harm in order to defend himself.

Collier's last statement to Newton, and his only statement to Burns, provides additional basis for our conclusion that Collier did not act from an unreasonable belief in self-defense. In his last statement to Newton, Collier admitted that he provoked the assault and participated with the seven other defendants in beating the victim.[1] Collier told Burns that Collier had simply initiated the attack and offered no justification of his doing so. Collier never stated, either to Newton or to Burns, that the victim attempted to physically defend himself by attacking Collier, or that Collier felt his life to be threatened by the victim, once Collier had initiated the assault. Thus, by Collier's own statements, Collier had neither a reasonable nor an unreasonable belief in his own defense when he attacked the victim, or when he then joined the seven other defendants in beating the victim. Consequently, Collier's statements do not support his position that he was acting in self-defense, either reasonably or unreasonably, and the erroneous admission into evidence of the other defendants' statements was harmless beyond a reasonable doubt.

▆▆ The remaining defendants maintain they acted in defense of Collier because it appeared Collier was "losing the fight" against the

---

[1]Although Collier also told Newton that he thought the victim was someone who had once "jumped him," the circumstance that the victim might have assaulted Collier at some point in the past was insufficient to justify Collier's attack of the victim on the night in question. See, *e.g.*, *People v. Wilson* (1972), 3 Ill. App. 3d 481, 278 N.E.2d 473.

victim. In none of their statements did any of the defendants indicate that he saw or heard the victim do or say anything to precipitate Collier's assault upon the victim. Thus, by their own admissions, the seven defendants believed Collier to be the one who provoked the struggle between Collier and the victim. Under these circumstances, the defendants could not lawfully intervene to aid Collier's assault upon the victim. (See, *e.g., People v. Davidson* (1987), 160 Ill. App. 3d 99, 514 N.E.2d 17, *appeal denied* (1987), 117 Ill. 2d 547.) Furthermore, although the defendants could intervene to defend Collier if the victim responded with superior force, the defendants' "right to use force in defense of [Collier was] limited to [Collier]'s right to defend himself. [Citations.]" (*People v. Castiglione* (1986), 150 Ill. App. 3d 459, 466 n.3, 501 ,N.E.2d 923, *appeal denied* (1987), 114 Ill. 2d 548.) Because the seven defendants' statements indicated that Collier was the aggressor, their use of great bodily harm upon the victim, in order to defend Collier, required that the victim himself first use deadly force or inflict great bodily harm upon Collier before the defendants could justifiably come to Collier's aid. (See *Castiglione*, 150 Ill. App. 3d at 466-67.) We find no indication in the defendants' statements to that effect.

Furthermore, even if it is assumed that the defendants believed the victim used a force that placed Collier's life in jeopardy or amounted to great bodily harm, the statements of these defendants did not support their defense that their actions were taken to defend Collier. Because the defendants believed Collier provoked the assault upon the victim, the defendants were obligated to exhaust "every reasonable means to escape *** [before using deadly force or great bodily harm upon the victim in order to defend Collier]." (Ill. Rev. Stat. 1983, ch. 38, par. 7–4(c)(1).) In none of the defendants' statements is there any reference to show that he believed that he or the others had attempted or considered any means of escape before they inflicted great bodily harm on the victim. Thus the defendants' statements do not reveal that they were acting in any belief, whether reasonable or unreasonable, that their actions were necessary to defend Collier from great bodily harm inflicted by the victim.

 Defendants Gregory Young, Paul Thomas, Leonard Thomas, and William Sewell also offered the defense of withdrawal. A person is said to withdraw when "[b]efore the commission of the offense, he terminates his effort to promote or facilitate such commission, and does one of the following: wholly deprives his prior efforts of effectiveness in such commission, or gives timely warning to the proper law enforcement authorities, or otherwise makes proper effort to pre-

vent the commission of the offense." Ill. Rev. Stat. 1983, ch. 38, par. 5—2(c)(3).

■■ Defendants Gregory Young and Paul Thomas base their withdrawal argument on those portions of their statements to the effect that they pulled Collier off the victim. Gregory Young and Paul Thomas maintain that by so doing, they prevented the victim's death at Collier's hand. However, neither Gregory Young nor Paul Thomas "wholly deprive[d] his prior efforts of effectiveness *** or [gave] timely warning to the [police], or otherwise [made] proper effort to prevent the commission of the offense." (Ill. Rev. Stat. 1983, ch. 38, par. 5—2(c)(3).) Instead of withdrawing by taking one of these steps, Gregory Young and Paul Thomas simply walked away from their unconscious victim, went to the liquor store to buy beer, and returned to the Thomas residence. Similarly, Leonard Thomas and William Sewell took none of the steps necessary to withdraw. Rather, they also simply walked away while the others continued their assault upon the victim. Based upon these statements of Gregory Young, Paul Thomas, Leonard Thomas, and William Sewell, none effectively withdrew. See, e.g., People v. Riddle (1988), 175 Ill. App. 3d 85, 91, 529 N.E.2d 713.

■■ Based on this reasoning that any error in the failure to sever defendants' trial was harmless beyond a reasonable doubt in light of the overwhelming evidence of each defendant's guilt, we also find no ground to reverse the defendants' convictions on the premise that they presented antagonistic defenses. (See, e.g., People v. Daugherty (1984), 102 Ill. 2d 533, 468 N.E.2d 969.) In addition, although not argued by any of the defendants on appeal, we would find harmless beyond a reasonable doubt the submission to the jury of erroneous jury instructions regarding voluntary manslaughter based on an unreasonable belief in self-defense or defense of another. (See People v. Reddick (1988), 123 Ill. 2d 184, 526 N.E.2d 141; People v. Brooks (1988), 175 Ill. App. 3d 136, 529 N.E.2d 732; People v. Carter (1988), 177 Ill. App. 3d 593, 532 N.E.2d 531; People v. Skipper (1988), 177 Ill. App. 3d 684, 533 N.E.2d 44.) We have closely reviewed the evidence against each defendant individually and find sufficient evidence from which the fact finders could conclude that each defendant was guilty beyond a reasonable doubt of the crimes for which he was convicted. See generally People v. McDonald (1988), 125 Ill. 2d 182, 201-02, 530 N.E.2d 1351.

Each of the defendants also argues that he was denied his right to a fair trial when the judge declined to question prospective jurors regarding whether the defendant's mere presence at the crime scene would create a presumption of guilt. Before jury selection, the defend-

ants requested that the judge pose the following question to prospective jurors: "If the evidence shows that a defendant was at the scene of the violence, would this create in your mind an assumption that because the defendant was there, he probably is guilty?" The trial court agreed to question prospective jurors concerning self-defense, but refused to ask the question about mere presence.

Upon review, the defendants claim that by the asking of this question the defense sought to probe prospective jurors' ability to properly apply the law of accountability. They argue that in *People v. Davis* (1983), 95 Ill. 2d 1, 17-18, 447 N.E.2d 353, the court recognized that it is proper to question prospective jurors on their ability to follow the law of accountability. Although *voir dire* questions "shall not directly or indirectly concern matters of law or instructions" (107 Ill. 2d R. 234), the court in *Davis* found no error in a question from the prosecutor that briefly recited accountability principles and then "inquired as to whether the jurors could follow the law even if the evidence revealed that the defendant did not actually do the shooting." *Davis*, 95 Ill. 2d at 18.

In the case at bar, however, the proffered question did not summarize accountability principles and then ask the jurors if they could properly apply those principles to the evidence, in order to discern fundamental bias or misperception of the prospective jurors. Rather the suggested question in the instant case was intended to test the jurors' understanding of the law of accountability before they had even been instructed with respect to accountability principles. Under these circumstances, we conclude that the trial court properly declined to submit the defense question to the prospective jurors during *voir dire*. See also *People v. Lexow* (1962), 23 Ill. 2d 541, 179 N.E.2d 683; *People v. McMullin* (1985), 138 Ill. App. 3d 872, 486 N.E.2d 412; *People v. Phillips* (1981), 99 Ill. App. 3d 362, 369, 425 N.E.2d 1040.

Defendants further maintain that they are entitled to new trials because the State failed to preserve a tape recording of Officer Newton's dictation of his notes of defendants' inculpatory post-arrest statements. Initially the trial court ordered that this recording be preserved. At the time the trial court's order was entered, however, the recording had already been transcribed and erased by officer personnel in the normal course of procedure at the Harvey police department. This transcription was disclosed to the defense prior to trial. Under these circumstances, we find defendants' argument insufficient ground to reverse their convictions. See, *e.g., People v. Chriswell* (1985), 133 Ill. App. 3d 458, 478 N.E.2d 1176.

Defendants also argue that the State failed to make timely

disclosure of the entire disciplinary record of Officer Newton. According to defendants, this disciplinary file contained information regarding Officer Newton's racial bias, which would have been properly explored during cross-examination of Officer Newton at trial. The officer's disciplinary record shows nothing to indicate racial bias, however, and the defendants therefore suffered no prejudice which would warrant new trials. See, *e.g., People v. Stevens* (1981), 102 Ill. App. 3d 773, 430 N.E.2d 331.

Defendants also argue that the trial court erred in allowing the State's motion *in limine* to prevent Perryman from testifying to the effect that he heard one of the persons in the group state, "He hit me in the mouth, that ***, let's get out of here." The defendants assert that this testimony should have been admitted at trial, because it tended to support both Collier's defense that he acted in self-defense (whether reasonably or unreasonably), and the remaining seven defendants' defenses that they acted to defend Collier (whether reasonably or unreasonably). (See, *e.g., People v. Clark* (1984), 129 Ill. App. 3d 374, 377, 472 N.E.2d 814.) Defendants also contend that Assistant State's Attorney Burns improperly testified at trial that he assisted in preparing the charges brought against the defendants, and that he did not cause the defendants' oral statements to be taken by a court reporter because, *inter alia*, he "did not believe" the defendants' oral statements. (See, *e.g., People v. Blissitt* (1973), 12 Ill. App. 3d 551, 299 N.E.2d 562.) Defendants further assert that the State made various improper remarks during closing argument and were erroneously permitted to read to the jury portions of the transcript of the State's witnesses regarding defendants' oral inculpatory statements. (See, *e.g., People v. Davies* (1977), 50 Ill. App. 3d 506, 365 N.E.2d 628.) In view of the overwhelming evidence of each defendant's guilt, as explained more fully above, we find defendants' arguments on these points insufficient ground to accord them new trials.

Collier asserts that the trial court erred when it refused to instruct the jury with respect to whether Collier acted "under a sudden and intense passion resulting from serious provocation" by the victim (Ill. Rev. Stat. 1983, ch. 38, par. 9—2; Illinois Pattern Jury Instructions, Criminal, No. 7.04 (2d ed. 1981)) because, according to one of Collier's statements, the victim struck Collier in the jaw where he had an abscessed tooth.

We decline to hold that the victim's alleged blow to Collier's abscessed tooth amounted to serious provocation. "Serious provocation is conduct sufficient to excite an intense passion in a reasonable person." (Ill. Rev. Stat. 1983, ch. 38, par. 9—2.) As the court

noted in *People v. Miller* (1981), 96 Ill. App. 3d 212, 421 N.E.2d 406:
" 'Passion on the part of the slayer, no matter how violent[,] will not
relieve him from liability for murder unless it is engendered by a
provocation which the law recognizes as being reasonable and ade-
quate. If the provocation is not sufficient the crime is murder. *** A
slight provocation will not be adequate since the provocation must be
proportionate to the manner in which the accused retaliated and
therefore if accused on a slight provocation attacked deceased with vi-
olence out of all proportion to the provocation and killed him the
crime is murder. ***.' " (*People v. Miller*, 96 Ill. App. 3d at 214-15,
quoting *People v. Matthews* (1974), 21 Ill. App. 3d 249, 253, 314
N.E.2d 15, 18.) The record here shows that Collier's attack, in concert
with the actions of the seven other defendants of which Collier was
well aware, was out of all proportion to the alleged provocation of be-
ing hit in the jaw. Accordingly, we find no error in the trial court's
refusal to instruct the jury with respect to Collier on voluntary man-
slaughter based on sudden and intense passion.

William Sewell argues that the trial court should have suppressed
the statements he made to Newton and Burns. He maintains that he
did not knowingly and intelligently waive his *Miranda* rights during
his interviews with the police officer and the assistant State's Attor-
ney. At a preliminary hearing on the question, William Sewell pre-
sented evidence to demonstrate that he has an intelligent quotient of
approximately 77, that he had a fifth-grade understanding of the En-
glish language, and that at the time of the offense he was in remedial
education classes. His father, who was present during the interview,
also stated that William Sewell did not appear to understand the
*Miranda* rights.

The mere circumstance that a person is not of average intel-
ligence is not, in itself, sufficient to warrant the conclusion that the
individual did not freely and knowingly waive his rights under
*Miranda*. (See, *e.g., People v. Leiker* (1983), 115 Ill. App. 3d 752, 755-
56, 450 N.E.2d 37.) Both Newton and Burns testified that they ex-
plained to William Sewell his *Miranda* rights, that he appeared to un-
derstand them, and that he voluntarily waived those rights. The trial
court assessed all of the evidence presented, and it was within the
court's province to conclude that William Sewell had knowingly and
voluntarily waived his rights. (*People v. King* (1987), 109 Ill. 2d 514,
515, 488 N.E.2d 949.) Because there is adequate evidence in the rec-
ord to support the trial court's decision, we cannot say that the trial
court abused its discretion when it denied William Sewell's motion to
suppress his statements to Newton and Burns.

Byron Reed also argues upon review that the record does not show his statements were voluntary. To support this position, he notes that he testified at the suppression hearing that he was given the proper *Miranda* warnings but was so scared and confused at the time that he did not understand what he was told. Byron Reed further points out that the State presented no witnesses to demonstrate that his statements were given voluntarily. Based on these matters in the record, Byron Reed maintains that the State failed to sustain its burden to establish that Byron Reed knowingly and intelligently waived his rights to counsel and to remain silent.

■■■ A review of the record belies Byron Reed's assertions. Byron Reed himself testified at the suppression hearing that the officers treated him professionally, did not strike or threaten him, did not lie to him, and gave him ample food and refreshment. It is well recognized that, as here, a defendant's own testimony may establish a *prima facie* case of voluntariness, and the State need not present additional testimony when its *prima facie* case is established by defense evidence. (*People v. Cozzi* (1981), 93 Ill. App. 3d 94, 98, 416 N.E.2d 1192; *People v. West* (1975), 25 Ill. App. 3d 827, 829, 322 N.E.2d 587.) The record fully supports the trial court's conclusion that Byron Reed's statements were made knowingly and intelligently, and the court properly allowed those statements to be admitted against Byron Reed at trial. See *People v. Clark* (1986), 114 Ill. 2d 450, 457, 501 N.E.2d 123.

■■■ William Sewell contends that he is entitled to a new trial because the assistant public defender who represented him at trial was laboring under a conflict of interest. William Sewell asserts that this conflict arose because another Cook County public defender was also representing, in an unrelated criminal case, a potential State's witness against William Sewell at his trial. It has been held that such representation by the Cook County public defender's office does not amount to a *per se* conflict of interest, and William Sewell makes no showing here that the circumstances presented an actual conflict of interest. (See *People v. Banks* (1988), 121 Ill. 2d 36, 526 N.E.2d 617; *People v. Coates* (1985), 109 Ill. 2d 431, 488 N.E.2d 247.) Accordingly, we determine that William Sewell's contention does not entitle him to a new trial.

■■■ Each of the defendants who was tried by a jury maintains that the State exercised its peremptory challenges to systematically exclude blacks from the jury. (See *Batson v. Kentucky* (1986), 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712.) Because this argument presents a factual question properly resolved by the trial court, we re-

mand the matter with respect to each of these defendants for a *Batson* hearing. (See, *e.g.*, *People v. McDonald* (1988), 125 Ill. 2d 182, 530 N.E.2d 1351; *People v. Evans* (1988), 125 Ill. 2d 50, 530 N.E.2d 1360.) If the court determines on remand that the State did not exercise its peremptory challenges in a racially discriminatory manner, these defendants' convictions shall stand affirmed. If the trial court determines on remand that the State did exercise its peremptory challenges in a racially discriminatory fashion, the trial court shall hold new trials with respect to each of these defendants. Because Byron Reed elected a bench trial rather than a trial by jury, the convictions of Byron Reed are affirmed without remand.

For the reasons stated, the convictions and sentences of all the defendants are affirmed and the matter remanded with directions to hold a *Batson* hearing with respect to each defendant except Byron Reed. The mittimus for each defendant is hereby modified to reflect only one murder conviction. *People v. Mack* (1984), 105 Ill. 2d 103, 473 N.E.2d 880.

Affirmed as modified and remanded with directions.

JIGANTI, P.J., and LINN, J., concur.