In the

# United States Court of Appeals

## For the Seventh Circuit

No. 11-1941

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

DEONTAE D. RICE,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Southern District of Illinois.
No. 3:10-cr-30157-WDS-1—**William D. Stiehl**, *Judge.*

ARGUED OCTOBER 24, 2011—DECIDED MARCH 7, 2012

Before SYKES and TINDER, *Circuit Judges*, and DEGUILIO, *District Judge.*[*]

DEGUILIO, *District Judge.* Deontae D. Rice was indicted on September 22, 2010, on one count of knowingly possessing a firearm on or about May 25, 2010, while being

[*] The Honorable Jon E. DeGuilio, Judge of the United States District Court for the Northern District of Indiana, sitting by designation.

an unlawful user of controlled substances in violation of 18 U.S.C. § 922(g)(3). Rice later pled guilty without a plea agreement and was sentenced to 46 months' imprisonment. On appeal, Rice challenges the district court's application at sentencing of a 4-level increase under U.S.S.G. § 2K2.1(b)(6) for using or possessing the firearm in connection with another felony offense. We affirm.

## I. BACKGROUND

On the evening of May 25, 2010, Rice and his wife, Myeara Rice, drove to the CITGO gas station in East St. Louis, Illinois. Upon arriving at the gas station Rice saw an acquaintance, Mario Davis. Rice approached Davis to obtain marijuana from him, having previously purchased marijuana from Davis numerous times. Davis refused and spit on Rice's face. Rice became furious and swung at Davis who was sitting in his vehicle, but Davis drove off. Despite his wife's protests, Rice followed Davis to his home because he was angry and wanted to fight. As Rice exited his truck, Davis emerged from his home with a firearm and fired a shot at Rice. The bullet pierced Rice's green Mercury Mountaineer leaving a hole.

Rice returned to his truck, where his wife was still waiting, and left in a rage. Rice drove erratically to his mother's home which was located in the same neighborhood on the 800 block of North 32nd Street. Although Rice's wife tried to calm him, Rice angrily accused her of working with Davis and she became frightened for her safety. Upon arriving at his mother's home, Rice

entered the home and asked his mother to give him a firearm that he kept at the home. At first his mother refused, but an agitated Rice was able to convince her to give him the firearm. Rice subsequently acknowledged that during this time he did not know whether Davis had followed him to his mother's home. Yet after Rice obtained the firearm, Rice's uncle informed him that he had seen Davis driving his pearl-colored Lincoln on their street.

Rice exited the home with the firearm in hand. According to Rice and his mother, Davis was not present at that time. Rice walked some distance from his mother's home toward his truck, between twenty to twenty-five yards, and waited outside for sometime between three and fifteen minutes without any sign of Davis. Finally, nearly a block away, Rice saw Davis's car heading in the opposite direction with Davis holding a firearm out of the window.

At that point, there was an exchange of gunfire. Police then responded to the 800 block of North 32nd Street to a report of shots fired at approximately 10:05 p.m., called in by Rice's wife who was hiding from Rice out of fear for her safety. When the officers approached the scene, Special Agent Nicholas Manns with the Federal Bureau of Investigation saw Rice standing on the west sidewalk of North 32nd Street near his green truck with a firearm in his hand. Numerous people were outside in the residential neighborhood, including children. The officers ordered Rice to drop the gun and he complied. Rice was then arrested.

In his interview with the police, Rice could not concretely say who fired first. Rice stated that he and Davis may have fired at the same time or that Rice could have fired first, but then Rice indicated that he thought Davis probably fired first. Rice also stated that he thought he was in danger when he fired his gun in the general direction of Davis, but admitted that he shot in the air because he did not want to kill anybody.

Police recovered from Rice a stolen semi-automatic nine-millimeter (.9 MM) Glock pistol that had twenty-two rounds of ammunition in the magazine and one round of ammunition in the chamber. Police also recovered three spent shell casings in the street on the driver's side of Rice's truck, which was parked directly across from his mother's home. The shell casings were believed to be from Rice's firearm which had an extended magazine capable of holding thirty-one rounds of ammunition. No other shell casings were found. Rice admitted to having sold marijuana in the recent past, and to having smoked marijuana at the time of his arrest.

Rice was charged with being an unlawful user of controlled substances in possession of a firearm and he later pleaded guilty without entering into a plea agreement. The district court accepted the guilty plea and ordered the preparation of a presentence investigation report. In Rice's presentence report, the probation officer applied the 2010 edition of the guidelines, placed Rice's base offense level at twenty because Rice was a prohibited person in possession of a semiautomatic firearm capable of accepting a large capacity maga-

zine, *see* U.S.S.G. § 2K2.1(a)(4)(B); added two levels because the firearm was stolen, *see id*. § 2K2.1(b)(4)(A); added four levels because Rice possessed the firearm during the commission of another felony offense, either aggravated discharge of a firearm under 720 Ill. Comp. Stat. 5/24-1.2(a), or reckless discharge of a firearm under 720 Ill. Comp. Stat. 5/24-1.5, *see* U.S.S.G. § 2K2.1(b)(6); and, subtracted three levels for acceptance of responsibility, *see id*. § 3E1.1, which resulted in a total offense level of twenty-three. Rice's criminal history category of I, combined with a total offense level of 23, yielded an advisory guidelines range of 46 to 57 months' imprisonment.

Rice filed an objection to the presentence report arguing that he acted in self-defense when he discharged his weapon which negated the felony offenses of aggravated or reckless discharge of the firearm under Illinois law and made the application of the enhancement under U.S.S.G. § 2K2.1(b)(6) improper.[1] Rice argued that Davis used deadly force against him, that he reasonably believed that his life was in danger, and that it was necessary for Rice to return fire to prevent Davis from

---

[1] Rice also objected to the base offense level arguing that he was not aware that the firearm had a large capacity magazine; but, he also admitted that there was no knowledge requirement for the guideline to apply. The district court concluded that Rice did not have to know that the firearm was capable of accepting a large capacity magazine, he simply had to possess the weapon. On appeal, Rice does not contest the district court's ruling in this respect.

coming back. After evidence was submitted and argument heard, the district court found that after Davis spit in Rice's face and then shot at Davis, "the Defendant went home, after some difficulty obtained a gun from his mother and went out and in effect looking for Mario, and from there they exchanged gunfire." The district court concluded that "the fact remains after the Defendant got home, there was no immediate threat or duress on the Defendant" and it was proper to apply the 4-level enhancement.

Having overruled Rice's objection, the district court adopted the presentence report without change and sentenced Rice to 46 months' imprisonment and 3 years' supervised release. Rice timely filed an appeal.

## II. ANALYSIS

On appeal Rice raises one issue: that the district court should not have applied a 4-level increase under U.S.S.G. § 2K2.1(b)(6) for his use or possession of the firearm "in connection with another felony offense." Rice concedes that his discharge of the firearm in a residential neighborhood with kids and other individuals present amounted to a felony under Illinois law because his conduct satisfied the statutory elements of both aggravated discharge of a firearm and reckless discharge of a firearm, consistent with 720 Ill. Comp. Stat. 5/24-1.2(a)[2]

---

[2] The crime of aggravated discharge of a firearm describes the following conduct:

(continued...)

and 720 Ill. Comp. Stat. 5/24-1.5,[3] respectively. Rice argues only that U.S.S.G. § 2K2.1(b)(6) should not apply because he discharged the firearm in self-defense to ward off Davis's purported attack, and therefore his actions were justified.

---

[2]  (...continued)

(a) A person commits aggravated discharge of a firearm when he or she knowingly or intentionally:

(1) Discharges a firearm at or into a building he or she knows or reasonably should know to be occupied and the firearm is discharged from a place or position outside that building;

(2) Discharges a firearm in the direction of another person or in the direction of a vehicle he or she knows or reasonably should know to be occupied by a person; . . . .

720 Ill. Comp. Stat. 5/24-1.2(a)(1)-(2). The statute also describes other methods of committing the crime by "knowingly or intentionally" discharging a firearm in the direction of certain officials (such as firemen, teachers, or paramedics) or shooting a gun in the direction of a particular vehicle the shooter knows to be occupied by certain officials. *See id.* 5/24-1.2(a)(3)-(9). A violation of any subsection of the statute is a felony. *See id.* 5/24-1.2(b).

[3]  The crime of reckless discharge of a firearm describes the following conduct:

(a) A person commits reckless discharge of a firearm by discharging a firearm in a reckless manner which endangers the bodily safety of an individual.

720 Ill. Comp. Stat. 5/24-1.5(a). Reckless discharge of a firearm is a Class 4 felony. *See id.* 5/24-1.5(c).

"We review the district court's application of sentencing guidelines de novo, but where the district court bases the application of a sentencing guideline on factual findings, we review for clear error." *United States v. Meece*, 580 F.3d 616, 620 (7th Cir. 2009) (quoting *United States v. Wagner,* 467 F.3d 1085, 1089 (7th Cir. 2006)). Review of a district court's sentencing enhancement under U.S.S.G. § 2K2.1(b)(6) is a mixed question of fact and law that we review for clear error. *Meece*, 580 F.3d at 620-21 (internal citations omitted). The district court's findings are clearly erroneous only when, "after considering all of the evidence, the reviewing court is left with the definite and firm conviction that a mistake has been made." *United States v. Cruz-Rea*, 626 F.3d 929, 938 (7th Cir. 2010) (quoting *United States v. Wyatt,* 102 F.3d 241, 246 (7th Cir. 1996)). Thus, when a district court chooses between two permissible inferences from the evidence, the factual findings cannot have been clearly erroneous. *Id*. Stated otherwise, "the task on appeal is not to see whether there is any evidence that might undercut the district court's finding; it is to see whether there is any evidence in the record to support the finding." *Cruz-Rea*, 626 F.3d at 938 (quoting *United States v. Wade,* 114 F.3d 103, 105 (7th Cir. 1997)).

In Illinois, force that is intended or likely to cause death or great bodily harm may be justified "only if [the defendant] reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or another or the commission of a forcible felony." 720 Ill. Comp. Stat. 5/7-1(a). Further, such deadly force may be used in defense of a dwelling

when entry is made or attempted in a violent, riotous, or tumultuous manner, and the defendant reasonably believes that the force is necessary to prevent an assault upon himself or another then in the dwelling or the commission of a felony in the dwelling. *See id*. 5/7-2(a).

To establish the affirmative defense of self-defense, the defendant must provide evidence supporting each of the following elements: (1) force had been threatened against the defendant; (2) the defendant was not the aggressor; (3) the danger of harm was imminent; (4) the force threatened was unlawful; (5) the defendant actually believed that the danger existed, that the use of force was necessary to avert the danger, and that the kind and amount of force actually used was necessary; and (6) the defendant's beliefs were reasonable. *See United States ex rel. Bell v. Pierson*, 267 F.3d 544, 552 (7th Cir. 2001) (citing *People v. Morgan*, 719 N.E.2d 681, 700 (Ill. 1999)); *People v. Garcia*, 942 N.E.2d 700, 708-09 (Ill. App. Ct. 2011). The government may then defeat the claim by proving beyond a reasonable doubt that one of the elements of self-defense is not met. *See Pierson*, 267 F.3d at 552 (citing *People v. Peterson*, 652 N.E.2d 1252, 1261 (Ill. App. Ct. 1995)).

A defendant's use of force cannot be justified by self-defense if he was the initial aggressor. *Morgan,* 719 N.E.2d at 700. Defense counsel conceded at oral argument that Rice was the aggressor when he followed Davis home from the gas station which led to Davis's firing a shot at Rice. But Rice contends that the

confrontation escalated into a separate and distinct en-
counter when Davis followed him home, presumably
to harm him. At sentencing the district court disagreed
and concluded that Rice "went out and in effect looking
for Mario."

The clear error standard of review on this appeal
is decisive. We believe the evidence establishes a permis-
sible inference that Rice was the aggressor and initiated
the confrontation. After he fled Davis's home, Rice
went looking for and retrieved a gun without knowing
whether Davis had in fact followed him. Only after Rice
armed himself in preparation to be the aggressor did
he learn that Davis had been spotted in the neighbor-
hood. Moreover, when Rice walked out of the home he
did not see Davis and there was no gunfire. Instead,
Rice walked almost sixty feet from the home and
waited outside for no less than three minutes before he
eventually spotted Davis some distance away in a car
with a firearm hanging out of the window. These facts
unequivocally established that Rice left his mother's
home with gun in hand looking for Davis. Rice was the
aggressor here—creating the confrontation rather than
unavoidably responding to it.

But Rice contends it was at the precise moment that
he saw Davis with a firearm which constitutes the im-
minent danger of harm and justified his discharge of the
firearm. Even assuming Rice saw Davis in the dark
armed with a gun, Davis was heading away from Rice
and at least a block away. These uncontested facts
suggest that Davis did not pose a threat, let alone an

imminent threat, to Rice or anyone at his mother's home. *See Garcia*, 942 N.E.2d at 708-09 ("[F]or self-defense to be justified, it must appear that the aggressor is capable of inflicting serious bodily harm [even] without the use of a deadly weapon, and is intending to do so." (quoting *People v. Hawkins*, 696 N.E.2d 16 (Ill. App. Ct. 1998))). In fact, Rice acknowledged that it was possible that he may have fired the first shot. Moreover, the shell casings recovered at the scene indicated that Rice fired three times, while no shell casings were recovered from the location where Davis allegedly fired shots. The evidence allows a permissible inference to be drawn that Rice was in fact looking for the opportunity to shoot Davis, and that Rice did not fire his gun in self-defense but rather as the aggressor.

Given that Rice was shot at by Davis earlier that same evening, in an incident that one might conclude Rice also initiated, we acknowledge it is possible that Rice actually believed that Davis would eventually return to continue the encounter. However, Rice's walking around armed for several minutes waiting for Davis to appear hardly suggests that Rice reasonably feared for his imminent safety. *See People v. Jeffries*, 646 N.E.2d 587, 598 (Ill. 1995) (the defendant must actually and subjectively believe that a danger existed that required the use of the force applied, and his subjective belief must be objectively reasonable) (citations omitted). Instead, there was evidence that Rice was enraged (as evidenced by his wife's fear of him), was using drugs, and simply wanted to retaliate against Davis for refusing to give him drugs and for spitting in his face. These facts

support the district court's conclusion that Rice went out looking for Davis, and clearly the right of self-defense does not justify an act of revenge or retaliation. *See People v. Jennings*, 644 N.E.2d 1199, 1206 (Ill. App. Ct. 1994) (citing *People v. Everette*, 565 N.E.2d 1295, 1301 (Ill. 1990)); *People v. Nunn*, 541 N.E.2d 182, 193 (Ill. App. Ct. 1989) ("[I]f one responds with such excessive force that one is no longer acting in self-defense but in retaliation, such excessive use of force renders one the protagonist.") (citations omitted). When Rice fired his gun in a residential neighborhood with children and others present, Davis was located at least a block away and was driving in the opposite direction from Rice and his mother's home. Any danger posed by the armed Davis was not imminent and did not justify Rice's shooting "cover" shots in the air in the direction of Davis. Given the surrounding facts and circumstances, Rice never needed to use a deadly weapon to avert imminent danger after he obtained the firearm from his mother. Any belief to the contrary, even if genuine, was not a reasonable one.

Rice's version of the events does not leave us with the definite and firm conviction that a mistake has been made. Rather, the record amply supports the district court's finding that Rice was the aggressor who went looking for Davis, and its conclusion that Rice did not act in self-defense under Illinois law when he committed the crimes of aggravated and reckless discharge of a firearm. Because we find no error in the district court's calculation of the sentencing guidelines, we affirm the sentence imposed by that court.

### III. CONCLUSION

For the foregoing reasons, Rice's sentence is AFFIRMED.