**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Michael E. WYATT, Defendant–
Appellant.**

No. 95–3490.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 27, 1996.

Decided Dec. 3, 1996.

Andrew B. Baker, Jr. (argued), Office of the United States Attorney, Dyer, IN, for Plaintiff–Appellee.

Suzanne Philbrick (argued), Portage, IN, for Defendant–Appellant.

Before CUMMINGS, EASTERBROOK and EVANS, Circuit Judges.

CUMMINGS, Circuit Judge.

A jury convicted Michael Wyatt for being a felon in possession of firearms in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). He was subsequently sentenced to 120 months' imprisonment. In this appeal, Wyatt contends that his conviction violated his rights under the Double Jeopardy Clause of the Fifth Amendment because his possession of firearms had previously been used as one of the bases for revoking a two-year term of supervised release that he was serving in connection with a prior criminal conviction.[1] Wyatt also contends that the district court committed clear error when it found that he possessed the firearms "in connection with" another felony offense and increased his base offense level by four levels pursuant to United States Sentencing Guideline § 2K2.1(b)(5). We affirm.

## I. BACKGROUND

In March 1994, the LaPorte County, Indiana, Police Department was conducting surveillance of Ray Tejeda, a suspected distributor of marijuana. Wyatt had also been a subject of the department's surveillance periodically for a number of years. On

---

1. Wyatt was previously convicted for attempted distribution of marijuana. His conviction, for which he was sentenced to 15 months' imprisonment followed by a two-year term of supervised release, was entered on October 16, 1992. Wyatt was discharged from the Bureau of Prisons on November 17, 1993, at which time his term of supervised release began. The events giving rise to the instant firearms conviction took place while he was on supervised release, which was revoked as a result of his possession of firearms (as well as possession of controlled substances, associating with a known felon, and other violations) on June 21, 1994.

March 5, 1994, the police observed Tejeda and another individual visit Wyatt's house. The police watched them enter the house, and they watched the house until Tejeda, the other individual, and Wyatt left. Tejeda and the other person left in one car; Wyatt left in another. The police stopped Wyatt on an outstanding warrant. Wyatt had $3,500 in his pocket; however, no marijuana or weapons were found in his possession or in his vehicle. Subsequently, a warrant for the search of Wyatt's home was obtained and executed.

Wyatt's residence was a small house with two bedrooms, a bathroom, kitchen, and living room on one floor and a basement. The master bedroom contained a waterbed, dresser and a safe. The police found a .22 caliber M–100 Calico short-barreled rifle on the floor under the overhang at the foot of the waterbed, which was about eight feet from the entrance of the room. The rifle had a 100–round magazine that was about half-full. Instead of the standard 16.1 inch barrel, the M–100 had a 5¼ inch barrel that was threaded to fit the two silencers which were found in a box on top of the dresser in the bedroom. The police also found a five-shot .38 caliber handgun concealed under some clothes or a box on a shelf in the master bedroom closet. The handgun was loaded with four rounds of ammunition. Both firearms were described by the police officer who found them as dusty and very unclean. He also stated that it appeared as if they had not been moved for some period of time. In addition to the firearms, the police found 559 rounds of ammunition of various calibers. About 80 percent of the ammunition fit the two weapons found in the bedroom. The safe in the master bedroom contained Wyatt's personal papers.

About two to three feet outside the entrance to the master bedroom sat a rolltop desk. In and on top of the rolltop desk, the officers found zip-lock plastic bags of a type used to package marijuana. The police also found two notebooks and several single sheets of paper in the rolltop desk. The officer who found these items testified that they appeared to be drug transaction records. Although no marijuana was found in the house, Wyatt subsequently admitted to engaging in drug transactions in his home.

At his trial, Wyatt attempted to establish through the testimony of one of his former wives, Jane Wright, that he did not possess the firearms. Wright testified that she lived in Wyatt's house, along with Wyatt's ten-year-old son, from August 1993 (while Wyatt was still in prison) to March 1994. Wright stated that following Wyatt's release from prison, he would come by the house to visit his son and would stay at the house on occasion. She testified that he would stay in the living room. According to Wright, she occupied the master bedroom and her understanding with Wyatt was that he would not go into the bedroom unless she was present and he had her permission. Wright also stated that the bedroom door had a padlock and she always kept it locked whenever she left the house. She left the house two to four times per month to go to Peru, Indiana to visit her family; and, she was out of town the day police arrested Wyatt and searched his house. When she returned the next day, she found that the lock and latch were not on the door; however, she was unaware of any damage having been done to the door.[2] She stated that she did not know if Wyatt had a key to the lock. With respect to the firearms that were seized, Wright testified that she put the M–100 rifle under the overhang of the waterbed and she put the handgun in the closet on the top shelf. On cross-examination, she acknowledged that the guns belonged to Wyatt and that he knew they were in the bedroom. She also acknowledged that the padlock was on the door when she first moved into the house in 1993 and that she obtained her key from Wyatt. She had no knowledge as to the number of keys in existence that opened the lock. Finally, she testified that she had no knowledge of who may have been in the house when she was out of town or what Wyatt may have done in the house at such times.

The jury was unpersuaded, and convicted Wyatt of being a felon in possession of fire-

---

**2.** During recross-examination, Wright testified that she could not recall if the padlock and latch were still on the door; she just remembered that the door was open.

arms. Following a sentencing hearing, the district court imposed a sentence of 120 months' imprisonment. Wyatt's sentence reflected, among other things, a 4–level enhancement under § 2K2.1(b)(5) of the sentencing guidelines because the district court determined that he possessed the firearms in connection with his distribution of marijuana. Wyatt attacks that determination as unsupported by the evidence. He also challenges his conviction as constitutionally infirm under the Double Jeopardy Clause.

## II. ANALYSIS

*Double Jeopardy*

■ Wyatt failed to present his double jeopardy argument to the district court; accordingly, we review for plain error.[3] *United States v. Penny*, 60 F.3d 1257, 1261 (7th Cir.1995), certiorari denied, —— U.S. ——, 116 S.Ct. 931, 133 L.Ed.2d 858.

Wyatt's argument that his prosecution for being a felon in possession violated his rights under the Double Jeopardy Clause because that same conduct served as a basis for revoking his supervised release, is one that has been considered and rejected by the Fourth, Ninth, and Tenth Circuits. See, e.g., *United States v. Woodrup*, 86 F.3d 359 (4th Cir.1996), certiorari denied, —— U.S. ——, 117 S.Ct. 332, 136 L.Ed.2d 245; *United States v. Soto–Olivas*, 44 F.3d 788 (9th Cir. 1995), certiorari denied, —— U.S. ——, 115 S.Ct. 2289, 132 L.Ed.2d 290; *United States v. Acuna–Diaz*, 1996 WL 282262 (10th Cir. 1996) (unpublished decision adopting the Ninth Circuit's reasoning in *Soto–Olivas*). In accord with our sister circuits, we also reject the argument.

The Double Jeopardy Clause provides: "[N]or shall any person be subject for the same offense to be twice put in jeopardy of life or limb." U.S. CONST. AMDT. 5. The Supreme Court has repeatedly explained that " 'the Clause serves the function of preventing both successive punishment and successive prosecution.' " *Witte v. United States*, —— U.S. ——, ——, 115 S.Ct. 2199, 2204, 132 L.Ed.2d 351 (quoting *United States v. Dixon*, 509 U.S. 688, 704, 113 S.Ct. 2849, 2860, 125 L.Ed.2d 556). As explained below, Wyatt's double jeopardy argument rests on the mistaken premise that the revocation of his term of supervised release—which was imposed as part of the sentence for his marijuana conviction—constituted a punishment for his possession of firearms.

Although this Circuit has never addressed the precise issue presented here, it has considered (and rejected) essentially the same double jeopardy argument in the closely analogous context of a parole revocation.[4] In *United States v. Hanahan*, 798 F.2d 187 (7th Cir.1986), a panel of this Court held that Double Jeopardy "protections are not triggered by the revocation of parole." *Id.* at 189. As Judge Bauer explained in *Hanahan*:

A parole revocation proceeding is an administrative proceeding designed to determine whether a parolee has violated the terms of his parole, not a proceeding designed to punish a criminal defendant for violation of a criminal law. A criminal prosecution is a judicial proceeding that vindicates the community's interests in punishing criminal conduct. Because the two proceedings serve different ends, the finding that the defendant no longer merits parole does not foreclose the criminal jus-

---

3. The standard of review is not determinative, however, for Wyatt's double jeopardy argument would be rejected even under de novo review.

4. In *United States v. Paskow*, 11 F.3d 873, 881 (9th Cir.1993), the Ninth Circuit highlighted the similarities between probation and supervised release:

Supervised release and parole are virtually identical systems. Under each, a defendant serves a portion of a sentence in prison and a portion under supervision outside prison walls. If a defendant violates the terms of his release, he may be incarcerated once more under the

terms of his original sentence. More specifically, a defendant's original sentence determines the length of the term of parole (indirectly) or supervised release (directly). It is also the original sentence that establishes how long the defendant may be required to serve following revocation in the case of both parole and supervised release violations. Finally, it is the original sentence that is executed when the defendant is returned to prison after a violation of the terms of both parole and supervised release.

tice system from punishing the defendant for that conduct.

*Id.*

Just as revocation of parole is not intended to serve as punishment for the subsequent misconduct that results in the revocation, revocation of supervised release is similarly designed to meet objectives entirely distinct from punishing the subsequent misconduct. Indeed, the Sentencing Commission expressly views violations of the conditions of super- vised released as a "breach of trust" and considers "the sentence imposed upon revocation [of supervised release as] intended to sanction the violator for failing to abide by the conditions of the court-ordered supervision, leaving the punishment for any new criminal conduct to the court responsible for imposing the sentence for that offense." United States Sentencing Commission, Guidelines Manual, Ch. 7 Pt. A § 3(b).

■ In this regard, it is critical to bear in . mind that supervised release is a part of the defendant's original sentence, see 18 U.S.C. § 3583(a) ("The court ... may include as a part of the sentence ... a term of supervised release"), and " 'it is the original sentence that is executed when the defendant is returned to prison after a violation of the terms' of his release." *Soto–Olivas,* 44 F.3d at 790 (quoting *Paskow,* 11 F.3d 873, 881 (9th Cir.1993)); see also *Woodrup,* 86 F.3d at 361 ("The sentence imposed upon revocation of a term of supervised release is an authorized part of the original sentence, just as the term of supervised release is an authorized part of the original sentence."). Thus, the proper understanding of a revocation of supervised release is simply that by engaging in prohibited conduct (criminal or not) during the term of supervised release, a defendant triggers a condition that permits modification of the terms of his original sentence. Cf. *Ralston v. Robinson,* 454 U.S. 201, 220 n. 14, 102 S.Ct. 233, 245 n. 14, 70 L.Ed.2d 345 (noting that sentences under the Federal Youth Corrections Act contemplate that subsequent offenses could result in modification of the FYCA treatment plan and that "[s]uch a scheme hardly constitutes multiple punish-

ment since the offender has, by his own actions, triggered the condition that permits appropriate modification of the terms of confinement"). Because revocation of supervised release amounts only to a modification of the terms of the defendant's original sentence, and does not constitute punishment for the revocation-triggering offense, the Double Jeopardy Clause is not violated by a subsequent prosecution for that offense. '

This conclusion is bolstered by the Supreme Court's decision in *Witte v. United States,* —— U.S. ——, 115 S.Ct. 2199, 132 L.Ed.2d 351, wherein the Court held that the Double Jeopardy Clause does not bar prosecution for an offense that had been considered as "relevant conduct" (resulting in an enhanced sentence) in a prior sentencing for a separate offense. Central to the Court's holding in *Witte,* was the conclusion that taking account of a defendant's criminal conduct in connection with crime X, for purposes of enhancing the defendant's sentence for crime Y, does not constitute punishment for crime X. —— U.S. at ——, 115 S.Ct. at 2206. Thus, it follows that the Double Jeopardy Clause is not violated by the defendant's subsequent prosecution for crime X. Of course, "enhancement" of a sentence may be effectuated by any one of a number of means—some of which are ex ante, such as when a district court invokes one of the Sentencing Guidelines' many base offense enhancing provisions, and some of which are ex post, such as revocation of probation, parole or supervised release—and nothing in the reasoning of *Witte* turned on the fact that the enhancement in that case derived from consideration of the defendant's "relevant conduct." Rather, the determinative rationale underlying *Witte* is that relying on conduct for purposes of enhancing a sentence does not constitute punishing that conduct. That same rationale underlies our holding here.

■ For the foregoing reasons, there is no error in Wyatt's conviction for firearms possession even though that same conduct was used as a basis for revoking his supervised release.[5]

---

5. As a corollary to his double jeopardy argument, Wyatt asserts that the government's prosecution

of him for firearms possession is barred by principles of collateral estoppel. This argument is

*Sentencing*

█ Wyatt maintains that the district court erred by enhancing his base offense level by four levels based on its determination that he possessed the firearms in connection with another felony offense. U.S.S.G. § 2K2.1(b)(5).[6] The district court's determination involves a mixed question of fact and law and is reviewed for clear error. *United States v. Gilbert,* 45 F.3d 1163 (7th Cir.1995); see also *United States v. Patterson,* 97 F.3d 192, 195 (7th Cir.1996) (stating that where the district court bases the application of a sentencing guideline on factual findings, the standard of review is clear error).[7] "A factual determination is clearly erroneous only if, after considering all of the evidence, the reviewing court is left with the definite and firm conviction that a mistake has been committed." *United States v. Messino,* 55 F.3d 1241, 1247 (7th Cir.1995) (internal quotation marks omitted). Furthermore,

a district court's choice between two permissible inferences from the evidence cannot be clearly erroneous. *Anderson v. Bessemer City,* 470 U.S. 564, 574, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518; *United States v. Bush,* 79 F.3d 64, 66 (7th Cir.1996).

Sentencing Guideline § 2K2.1(b)(5) provides in pertinent part: "If the defendant used or possessed any firearm or ammunition in connection with another felony offense ... increase [the offense level] by 4 levels." The government bore the burden of proving by a preponderance of the evidence that this enhancement was applicable. *United States v. Foutris,* 966 F.2d 1158, 1160 (7th Cir.1992). As explained below, the district judge's conclusion that the government met its burden and that the four-level enhancement applied is not clearly erroneous.

Although Wyatt attempted to establish through Wright's testimony in the district

without any foundation whatsoever. Under general principles of collateral estoppel (or, to use its more contemporary name, "issue preclusion"), when an issue has been actually decided in a prior adjudication (and determination of the issue was necessary to the decision), a party who had a full and fair opportunity to litigate the issue will be foreclosed in subsequent litigation from advocating a position on the issue inconsistent with the prior decision. See generally *Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552; see also RESTATEMENT (SECOND) JUDGMENTS § 27 cmt. c ("[I]f the party against whom preclusion is sought did in fact litigate an issue of ultimate fact and suffered an adverse determination, new evidentiary facts may not be brought forward to obtain a different determination of that ultimate fact."); 1B MOORE'S FEDERAL PRACTICE para. 0.443[2] at III–566 ("Any contention that is necessarily inconsistent with a prior adjudication of a material and litigated issue ... is ... precluded by the effect of the prior judgment as collateral estoppel."). Here the government has not taken any position in Wyatt's possession of firearms prosecution that is inconsistent in any way with its position in the supervised-release revocation hearing. Therefore, the doctrine of issue preclusion has no applicability to this case.

**6.** The November 1, 1994 version of the Sentencing Guidelines governed Wyatt's sentencing.

**7.** 18 U.S.C. § 3742(e) provides: "The court of appeals shall give due regard to the opportunity of the district court to judge the credibility of the witnesses, and shall accept the findings of fact of the district court unless they are clearly errone-

ous and shall give due deference to the district court's application of the guidelines to the facts." The Supreme Court's recent decision in *Koon v. United States,* —— U.S. ——, ——, 116 S.Ct. 2035, 2046, 135 L.Ed.2d 392, instructs that "[t]he deference that is due depends on the nature of the question presented." The Court's specific holding in *Koon* (viz., that appellate review of a district court's decision to depart from the sentencing ranges in the guidelines should be governed by an abuse of discretion standard) does not control the instant case. As the Court noted in *Koon,* "[a] district court's decision to depart from the Guidelines ... will in most cases be due substantial deference, for it embodies the traditional exercise of discretion by a sentencing court." *Id.;* see also *United States v. Horton,* 98 F.3d 313, 317 (7th Cir.1996) ("A district judge's determination of the extent of an upward departure, designed to take into consideration the unique factual circumstances of the atypical case, is by nature a discretionary decision."). Accordingly, the abuse of discretion standard is the appropriate standard for reviewing departures. This case does not involve a discretionary departure; rather, it involves the district court's application of § 2K2.1(b)(5)'s mandatory enhancement for possessing firearms in connection with another felony, which entailed a highly fact specific determination by the district judge. We give due deference to such factual determinations, and the district court's application of the guidelines to the facts, by reviewing only for clear error. *Patterson,* 97 F.3d at 195; cf. *United States v. Wetwattana,* 94 F.3d 280, 283 (7th Cir.1996) (reviewing a § 2D1.1(b)(1) [possession of firearm in connection with a drug trafficking offense] enhancement for clear error).

court that he did not "possess" the firearms, the jury rejected that argument and he does not press that contention on appeal. Nor does he deny that he was engaged in felonious conduct, viz., possession with intent to distribute marijuana.[8] Wyatt's only contention with respect to his sentence is that the government failed to establish that the firearms found in his bedroom were possessed "in connection with" his marijuana dealing. Because the Sentencing Guidelines do not define the expression "in connection with," it should be given its common ordinary meaning. *Messino,* 55 F.3d at 1255 (citing *United States v. Brewster,* 1 F.3d 51, 54 (1st Cir. 1993)); *United States v. Brannan,* 74 F.3d 448, 453 (3d Cir.1996) (relying on dictionary definition of "connection" as requiring some "causal or logical relation"); *United States v. Condren,* 18 F.3d 1190, 1196 (5th Cir.1994), certiorari denied, — U.S. —, 115 S.Ct. 161, 130 L.Ed.2d 99; cf. *Smith v. United States,* 508 U.S. 223, 228, 113 S.Ct. 2050, 2054, 124 L.Ed.2d 138 (noting that "[w]hen a word is not defined by statute, we normally construe it in accord with its ordinary or natural meaning"). While no simple judicial formula can adequately capture the precise contours of the "in connection with" requirement, particularly in light of the myriad factual contexts in which the phrase might come into play, the Supreme Court's elucidation of the phrase "in relation to" as used in 18 U.S.C. § 924(c)(1)[9] is illuminating:

> The phrase "in relation to" thus, at a minimum, clarifies that the firearms must have some purpose or effect with respect to the drug trafficking crime; its presence or involvement cannot be the result of accident or coincidence.... Instead, the gun must facilitat[e], or ha[ve] the potential of facilitating, the drug trafficking offense.

*Smith v. United States,* 508 U.S. at 238, 113 S.Ct. at 2058–59 (internal quotation marks and citations omitted). Thus, like the phrase "in relation to," the meaning of the phrase "in connection with" should be construed expansively. *Id.* at 237–38, 113 S.Ct. at 2058–59; *United States v. Thompson,* 32 F.3d 1, 7 (1st Cir.1994). So long as the government proves by a preponderance of the evidence that the firearm served some purpose with respect to the felonious conduct, section 2K2.1(b)(5)'s "in connection with" requirement is satisfied; conversely, where the firearm's presence is merely coincidental to that conduct, the requirement is not met.

So, for instance, in *United States v. Routon,* 25 F.3d 815, 819 (9th Cir.1994), the Ninth Circuit has determined that the "in connection with" requirement is satisfied where the "firearm was possessed in a manner that permits an inference that it facilitated or potentially facilitated—i.e., had some potential emboldening role in—a defendant's felonious conduct." And, the First Circuit has stated that "the phrase 'in connection with' should be interpreted broadly and ... where a defendant's possession of a firearm aids or facilitates the commission of another offense, the requisite link is present." *Thompson,* 32 F.3d at 7. In light of the Supreme Court's discussion in *Smith,* we concur with these statements of the controlling standard.

The uncontroverted evidence presented at Wyatt's trial and sentencing hearing established that Wyatt maintained two concealed loaded weapons in the bedroom of his small house. It is also undisputed that Wyatt distributed marijuana from the house and stored marijuana in the house. Although the weapons were concealed under

---

**8.** United States Treasury Department, Bureau of Alcohol, Tobacco and Firearms special agent Van D. Tuley testified on behalf of the government at Wyatt's sentencing hearing. Tuley stated that he interviewed Wyatt shortly after his arrest. During that interview Wyatt admitted that he was engaged in marijuana distribution, along with Tejeda, out of his (Wyatt's) home. Tuley's testimony was uncontroverted.

**9.** Section 924(c)(1) requires a mandatory additional sentence for defendants convicted of a violent or drug trafficking crime where the defendant used or carried a firearm "during and in relation to" such crime. Like the Ninth Circuit, see *United States v. Polanco,* 93 F.3d 555 (9th Cir.1996), certiorari denied, — U.S. —, 117 S.Ct. 405, 136 L.Ed.2d 319; *United States v. Routon,* 25 F.3d 815, 818 (9th Cir.1994), we can discern no material difference between the expressions "in connection with" and "in relation to," and find judicial construction of the latter expression to be instructive as to the meaning of the former.

the bed and on a shelf in the closet, there is no indication in the record that the weapons were not readily accessible. Furthermore, the weapons were stored just a few feet from where Wyatt maintained his drug ledgers and drug packaging materials. From these facts, Judge Miller inferred that the weapons served the purpose of "protect[ing] the business and the stored marijuana." From the fact that the weapons were described by police as being dusty, he inferred that Wyatt "may never have been called upon to use the guns to protect the business, the drugs, or himself"; however, he deemed this point to be immaterial. We find no clear error in the inferences or conclusions drawn by Judge Miller.

As this Court has had opportunity to remark on all too many occasions, "[i]t is widely acknowledged that guns are 'tools' of the trade" in the drug business, *United States v. Turner*, 93 F.3d 276, 289 (7th Cir.1996).[10] This is not a case where an unloaded hunting rifle was found in the defendant's closet. Compare U.S.S.G. § 2D1.1(b)(1), Application Note 3. Rather, two loaded weapons—one of which was a short-barreled rifle that was threaded to fit either of two silencers found in the room—were seized in close proximity to where Wyatt maintained his drug records and packaging materials. The accessibility and proximity of Wyatt's weapons to these drug-related materials supports the inference that they were possessed in connection with his illicit dealings, see *United States v. Ewing*, 979 F.2d 1234, 1238 (7th Cir.1992) ("The seizure of a firearm in close proximity to illegal drugs is powerful support for the inference that the firearm was used in connection with the drug trafficking operation."), as does the type of weapons involved. Hand-

guns and sawed-off rifles (particularly those threaded to fit a silencing device) are commonly associated with drug trafficking.[11] See *United States v. Cantero*, 995 F.2d 1407, 1411 (7th Cir.1993). Furthermore, the point should not be lost that Ms. Wright testified that she always locked the master bedroom door when she left the house. Yet the trial evidence in this case suggested that the bedroom door was not locked on the day that Wyatt was known to be in the house and suspected of engaging in drug transactions, and later found to be in possession of $3,500.[12] A reasonable inference is that Wyatt unlocked the bedroom door in order to have more ready access to his weapons for purposes of protecting his money and drugs in the event that a deal went sour. At the very least the weapons "had some potential emboldening role" in Wyatt's drug dealings. *Routon*, 25 F.3d at 819.

Although the evidence in this case bearing on the issue of whether Wyatt's possession of firearms was "in connection with" his drug trafficking is open to different interpretations, the inferences drawn by the district court were sufficiently supported by the evidence. Therefore, they cannot be considered "clearly erroneous"; accordingly, the judgment of the district court is affirmed.

AFFIRMED.

---

10. *Turner*, like other cases cited in this paragraph, involved a different sentencing guideline, namely § 2D1.1(b)(1)—which provides for an enhancement if a dangerous weapon is possessed during a drug offense unless it is clearly improbable that the weapon was connected with the offense. See U.S.S.G. § 2D1.1(b)(1) and Application Note 3. However, this difference is immaterial for purposes of evaluating the inferences that may be drawn from the evidence.

11. Indeed, one is hard-pressed to imagine a non-criminal purpose for possessing a sawed-off rifle equipped to fit a silencer.

12. Wright testified that when she returned to the house the next day, the bedroom door was unlocked and there was no evidence of any damage having been done to the door (which might be expected if the police had to rip off a lock to gain access to the bedroom). Additionally, one of the officers who participated in the search had no recollection of there being a lock on the bedroom door.