In the

# United States Court of Appeals

### For the Seventh Circuit

No. 09-2700

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

CHARLES SUGGS,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 1:08-cr-00138—**David F. Hamilton**, *Judge.*

ARGUED APRIL 27, 2010—DECIDED OCTOBER 1, 2010

Before ROVNER, WILLIAMS, and SYKES, *Circuit Judges.*

SYKES, *Circuit Judge.* Police officers arrested Charles
Suggs after a traffic stop during which he pulled a hand-
gun from beneath the driver's seat of his truck. Suggs
later pleaded guilty to being a felon in possession of a
firearm, *see* 18 U.S.C. § 922(g)(1), and was sentenced to
108 months' imprisonment. On appeal Suggs challenges
the district court's application at sentencing of a 4-level
increase under U.S.S.G. § 2K2.1(b)(6) for using or pos-

sessing the firearm in connection with another felony offense. We affirm.

## I. Background

On April 29, 2007, Officer Javie Settlemoir of the Danville Police Department was dispatched to investigate a report of a possible drunk driver driving a red pickup truck. Officer Settlemoir and another officer located the truck and saw its driver commit several traffic offenses. Settlemoir initiated a traffic stop, but the driver did not immediately stop. Eventually, the driver pulled into a parking lot.

As officers approached the truck, the driver, Suggs, stepped out and began to gather documents, first from his wallet and then from the vehicle's glove compartment. He informed the officers that he did not have his license with him. The officers asked Suggs to step to the rear of the vehicle. He did not comply; instead, he leaned into the truck, this time reaching under the front seat. Officer Settlemoir tried several times to grab Suggs's arm and pull it from the cab of the truck, repeating his directive that Suggs move to the rear of the vehicle. Each time, Suggs wrested his arm free and reached again under the front seat of the truck. On the fourth try, Settlemoir was able to grab Suggs's right forearm and jerk it, and the force of Settlemoir's tug knocked a handgun out of Suggs's right hand. Settlemoir and another officer then secured and handcuffed Suggs. When the officers asked what he had intended to do

with the weapon, Suggs replied, "I was going to give it to you." Officers then arrested Suggs.

Suggs was later charged with being a felon in possession of a firearm and pleaded guilty pursuant to a plea agreement. In Suggs's presentence report, the probation officer applied a base offense level of 20, *see* U.S.S.G. § 2K2.1(a)(4)(A); added two levels because the firearm was stolen, *see id.* § 2K2.1(b)(4)(A); added four levels because Suggs possessed the firearm in the commission of another felony offense, resisting law enforcement with a deadly weapon under section 35-44-3-3(b)(1)(B) of the Indiana Code, *see* U.S.S.G. § 2K2.1(b)(6); and subtracted three levels for acceptance of responsibility, *see id.* § 3E1.1, resulting in a total offense level of 23. With Suggs's criminal history category of IV, this yielded a guidelines range of 70 to 87 months' imprisonment.

At sentencing Suggs disputed the 4-level increase under § 2K2.1(b)(6). This guideline applies if a defendant "used or possessed any firearm or ammunition in connection with another felony offense." *See id.* § 2K2.1(b)(6). Suggs conceded that he "possessed" a firearm while resisting the officers. But he disputed that his possession related to another felony offense; he asserted instead that his actions fell under section 35-44-3-3(a)(1), the Indiana statute that makes it a Class A misdemeanor to "forcibly resist[], obstruct[], or interfere[] with a law enforcement officer or a person assisting the officer while the officer is lawfully engaged in the execution of the officer's duties." He argued that he neither "drew" nor "used" the handgun as required to elevate

this offense to a Class D felony under Indiana law. *See* IND. CODE § 35-44-3-3(b)(1)(B). Had the district court agreed, the resulting total offense level of 19 would have corresponded to a guidelines range of 46 to 57 months' imprisonment.

After hearing argument, the district court disagreed, finding that Suggs had drawn the weapon within the meaning of section 35-44-3-3(b)(1)(B) and adopting the guidelines calculations recommended by the presentence report. The court then imposed a 108-month, above-guidelines prison sentence, citing among other things Suggs's quick return to crime after completing his 20-year prison term for murder and the court's belief that his long criminal history was underrepresented by the applicable guidelines range. When pronouncing the sentence, the judge noted that he would have imposed the same sentence even if it had not applied § 2K2.1(b)(6).

## II. Discussion

On appeal Suggs reiterates his argument that the district court should not have applied a 4-level increase under § 2K2.1(b)(6). This argument actually comprises two related arguments. The first involves the applicability of § 2K2.1(b)(6) to his conduct; Suggs argues that § 2K2.1(b)(6) should not apply because he never "used" the firearm within the meaning of the guideline. The second, related argument involves the proper characterization of his conduct under section 35-44-3-3, the Indiana resisting-law-enforcement statute; Suggs

asserts that his conduct did not satisfy the statutory requirements necessary to make his violation of section 35-44-3-3 a felony rather than a misdemeanor under Indiana law.

Regarding the first argument, Suggs argues that he did not "use" the handgun during the traffic stop within the meaning of § 2K2.1(b)(6) because applicable precedent has defined "use" to mean active employment or implementation. *See United States v. Lang*, 537 F.3d 718, 720-21 (7th Cir. 2008) (defining "use" under § 2K2.1 as employment for some purpose); *see also Bailey v. United States*, 516 U.S. 137, 143 (1995) (holding that use of a firearm "signifies active employment" and "more than mere possession"). At most, Suggs contends, he merely pulled the handgun from beneath the seat.

But Suggs's argument omits a key consideration: He need not have "used" the firearm for § 2K2.1(b)(6) to apply. The guideline requires the court to apply a 4-level increase "[i]f the defendant used or possessed any firearm or ammunition in connection with another felony offense." U.S.S.G. § 2K2.1(b)(6). Though the facts suggest that Suggs never had the opportunity to actively employ the handgun, he does not deny that he "possessed" the firearm when he grasped it while resisting the officers. This is all that is needed to trigger application of § 2K2.1(b)(6). And possession alone is sufficient to bring a felony in which the firearm was involved within the meaning of § 2K2.1(b)(6) as long as the handgun had some purpose or effect in, or facilitated, the related felony. *See United States v. LePage*, 477 F.3d 485,

489 (7th Cir. 2007); *United States v. Haynes*, 179 F.3d 1045, 1047 (7th Cir. 1999); *United States v. Wyatt*, 102 F.3d 241, 247 (7th Cir. 1996).

The matter turns, then, on the second question: whether the district court clearly erred in finding that Suggs's possession of the firearm while resisting officers under section 35-44-3-3 amounted to a felony under Indiana law. *See United States v. Meece*, 580 F.3d 616, 620-21 (7th Cir. 2009) (stating that a district court's application of § 2K2.1(b)(6) is "a mixed question of fact and law" subject to clear-error review) (quotation marks omitted); *United States v. Canady*, 578 F.3d 665, 673 (7th Cir. 2009) (applying clear-error review to a district court's application of guidelines based on factual findings). Again, Suggs urges that his conduct during the traffic stop constituted merely misdemeanor resisting under section 35-44-3-3(a)(1). Section 35-44-3-3(b)(1)(B), by contrast, renders such conduct a Class D felony if while it is committed "the person draws or uses a deadly weapon, inflicts bodily injury on or otherwise causes bodily injury to another person, or operates a vehicle in a manner that creates a substantial risk of bodily injury to another person." At sentencing the district court concluded that Suggs "drew" the handgun within the meaning of section 35-44-3-3(b)(1)(B) by pulling it from beneath the seat of his truck.

In disputing this conclusion, Suggs relies primarily on *Dunkle v. State*, 173 N.E.2d 657 (Ind. 1961), which considered the meaning of "draw" under Indiana law. In *Dunkle* the Indiana Supreme Court interpreted several now-

superceded statutory provisions to distinguish "drawing" a dangerous weapon from "pointing" or "aiming" such a weapon. *Id.* at 659. The court concluded, in part, that "drawing" a weapon is "the *act by which the particular weapon is taken out of or removed for use*, from the enclosure which contained it." *Id.* Few recent cases have cited *Dunkle* or interpreted the meaning of "draw," but some Indiana courts have interpreted *Dunkle* to hold that "drawing" requires removal of a weapon for use from an enclosure on one's person specifically designed to contain the weapon itself, such as a sheath or holster. *See Willumsen v. State*, No. 84A05-0809-CR-530, 2009 WL 440427, at *2 (Ind. Ct. App. Feb. 20, 2009) (non-precedential disposition); *Wise v. State*, 401 N.E.2d 65, 70 (Ind. Ct. App. 1980). Suggs insists that he could not have "drawn" the handgun from beneath the seat because it was not contained in an enclosure such as a holster or sheath.

Close inspection, however, reveals that *Dunkle* was concerned primarily with distinguishing "drawing" from other modes of employment of a deadly weapon. *See Dunkle*, 173 N.E.2d at 659; *see also Palmer v. Decker*, 255 N.E.2d 797, 799 (Ind. 1970); *Burk v. State*, 716 N.E.2d 39, 43 (Ind. Ct. App. 1999). Though the *Dunkle* court noted that the weapons listed in the then-operative statutory scheme (which included "pistol[s], dirk[s], kni[ves], slung-shot[s], or other deadly or dangerous weapon[s]") were commonly carried in a "small enclosure upon a person," it did not state that they were always carried this way or that the enclosure *must* be on the person. 173 N.E.2d at 659 (quotation marks omitted).

The definition instead suggests that the salient character of "drawing" a weapon is the common-sense understanding of bringing it forth and preparing it for use. *See id.* at 659 n.2 (defining "draw" as "[t]o cause to come out; to extract; to educe; to bring forth; as . . . from some receptacle") (quotation marks omitted).

More importantly, however, Suggs's reliance on *Dunkle* is undermined by Indiana's modern statutory scheme. *Dunkle* involves the interpretation of "draw" under a long-defunct statutory scheme; Indiana's current statutory scheme defines "deadly weapon" quite broadly, *see* IND. CODE § 35-41-1-8, to include any material that "is used, or could ordinarily be used, or is intended to be used" to cause serious bodily injury. This includes, but is not limited to, firearms, tasers, stun guns, chemicals, biological diseases or viruses, animals, or other equipment. *Id*. This broad definition suggests that Suggs's proposed limitation on the understanding of "drawing" a deadly weapon is untenable, even assuming he is correct about its meaning under the *Dunkle*-era statutory scheme.

Indiana's Pattern Jury Instructions lend further support to this broader reading and suggest that juries are entrusted to use the ordinary, common-sense understanding of "draw" when deciding whether a defendant's conduct constitutes "drawing" a weapon under the statute.[1] For example, the pattern jury

---

[1] Though Indiana courts have not formally endorsed the Indiana Pattern Jury Instructions, they give them significant

(continued...)

instruction for section 35-44-3-3 closely tracks the statute's text but provides no special guidance to juries regarding the nature of "drawing" under the statute. *See* 1 CRIMINAL INSTRUCTIONS COMM. OF THE INDIANA JUDGE'S ASS'N, INDIANA PATTERN JURY INSTRUCTIONS— CRIMINAL NO. 5.23 (3d ed. 2003). And we have found no additional pattern instruction limiting jurors' under-standing of "draw" under Indiana law. Common Indiana practice, then, leaves juror-factfinders— much like the sentencing court below—free to apply a common-sense understanding when determining whether a defendant's actions constitute "drawing" a weapon. *See Roche v. State*, 690 N.E.2d 1115, 1128 (Ind. 1997) (stating that "where terms are in general use and can be understood by a person of ordinary intelligence, they need not be defined" for jurors) (quotation marks omit-ted); *McFarland v. State*, 390 N.E.2d 989, 994 (Ind. 1979) (same).

Suggs responds that even if pulling the handgun from beneath the seat *can* constitute drawing, he did not *successfully* draw the gun because the officer's tug on his arm knocked it from his hand to the floor of the vehicle. But Suggs's recollection of events does not square with the account the district court credited at sentencing, and we will not disturb the district court's determination unless its view of events lacked support in the evidence.

---

[1] (...continued)
preferential status. *See Schultz v. Ford Motor Co.*, 857 N.E.2d 977, 980 n.2 (Ind. 2006).

*See United States v. Boyd*, 475 F.3d 875, 876 (7th Cir. 2007); *United States v. Markovitch*, 442 F.3d 1029, 1031-32 (7th Cir. 2006); *Wyatt*, 102 F.3d at 248. No witnesses testified at Suggs's sentencing hearing, and the court credited Officer Settlemoir's probable-cause affidavit, which suggests that Suggs had pulled the handgun from beneath the seat before it was knocked from his hand:

> [Suggs] once again pulled away and started back under the seat. At that point I leaned way over his body and got his right forearm and jerked it towards me. As I jerked his arm I clearly saw a handgun in his right hand. The force of me jerking his arm knocked the handgun from his grip and the handgun fell to the floorboard of the truck.

The presentence report recounted that Settlemoir saw the handgun in Suggs's hand as he struggled to keep Suggs from reaching into the cabin of the truck: "At that point, the two officers forcibly removed Suggs from the truck, and in the process, observed a handgun in Suggs' right hand. During the altercation, the gun was knocked out of Suggs' hand, and he was placed in handcuffs without further incident."

Both passages make clear that Suggs sought to draw the weapon without first informing the officers of its presence. The district court could reasonably conclude that Suggs grasped the handgun while resisting officers and ignored their orders to step to the rear of the vehicle. And it was likewise reasonable for the court to infer that Suggs's grasp for the handgun without alerting the officers to its presence implied an intent to bring it forth

and use it in some manner. *United States v. Robinson*, 537 F.3d 798, 803-04 (7th Cir. 2008). The district court's conclusion that only a split-second separated the retrieval of the handgun from its actual use suggests that Suggs's act of grasping and removing it from beneath the seat was sufficient to count as "drawing" under the statute. *See Slater v. State*, 440 N.E.2d 677 (Ind. 1982) (finding that mere reference to an undisplayed weapon can constitute "use").

In any event, the district court also made clear that it "would impose the same sentence regardless of the precise technical answer to [the § 2K2.1(b)(6)] question under the guidelines." An error in a guideline application may be harmless where the government establishes that the error did not affect a defendant's substantial rights or liberty. *See United States v. Zahursky*, 580 F.3d 515, 527 (7th Cir. 2009); *United States v. Abbas*, 560 F.3d 660, 667 (7th Cir. 2009). The government can meet this burden by showing that the error "did not affect the district court's selection of the sentence imposed." *See United States v. Eubanks*, 593 F.3d 645, 655 (7th Cir. 2010) (quotation marks omitted); *United States v. Anderson*, 517 F.3d 953, 965 (7th Cir. 2008) (quotation marks omitted). The district court acknowledged the application of § 2K2.1(b)(6) to be a close call but considered Suggs's long history of violent criminal behavior to be more important to the ultimate sentencing decision. The court noted that many of Suggs's prior run-ins with the law were not reflected in his criminal history, including several convictions that preceded his 1986 murder conviction. In addition, the court noted that Suggs was

found in possession of a recently stolen credit card bearing over $400 in unauthorized charges.

And, notwithstanding application of § 2K2.1(b)(6), the district court amply explained its reasons for imposing an above-guidelines sentence in light of the factors set forth in 18 U.S.C. § 3553(a). *See United States v. Mays*, 593 F.3d 603, 609 (7th Cir. 2010); *United States v. Wise*, 556 F.3d 629, 632-33 (7th Cir. 2009); *United States v. Tockes*, 530 F.3d 628, 632 (7th Cir. 2008). The judge highlighted the dangerous and volatile nature of Suggs's offense, citing in addition the aggravating facts that the handgun was stolen and contained hollow-point bullets. The court also noted that at the very least, Suggs sought to pull the handgun from the truck without notifying the officers of its presence and while resisting arrest, justifying an above-guidelines sentence.

AFFIRMED.